Evan L. James, Esq. (NSB No. 7760)
CHRISTENSEN JAMES & MARTIN
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
E-mail: elj@cjmlv.com

Brett L. Tolman, Esq. (USB No. 8821) *Admitted Pro Hac Vice (Pending)*
Eric G. Benson, Esq. (USB No. 10414) *Admitted Pro Hac Vice (Pending)*
RAY QUINNEY & NEBEKER P.C.
36 South State Street, #1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Fax: (801) 532-7543
E-mail:  btolman@rqn.com
          ebenson@rqn.com

*Attorneys for Defendant Jonathan Eborn*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>vs.<br><br>INFUSION MEDIA, INC., *et al.*,<br><br>    Defendants. | Case No. 2:09-cv-01112-GMN-VCF<br>**MOTION FOR LEAVE TO FILE AMENDED RESPONSE TO FEDERAL TRADE COMMISSION'S MOTION TO ENTER JUDGMENT HOLDING DEFENDANT JONATHAN EBORN LIABLE FOR FULL MONETARY JUDGMENT AND ORDER** |

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendant Jonathan Eborn ("Eborn") respectfully files this Motion for Leave to File Amended Response to Federal Trade Commission's ("FTC's") Motion to Enter Judgment Holding Defendant Jonathan Eborn Liable

1

for Full Monetary Judgment. This Memorandum is based upon the Memorandum of Points and Authorities and Exhibits attached hereto, the papers and pleadings on file herein, and any oral argument presented at the time of hearing.

DATED this 18th day of April, 2014

CHRISTENSEN JAMES & MARTIN

By: /s/ Evan L. James
    Evan L. James, Esq.
    Nevada Bar No. 7760
    7440 W. Sahara Avenue
    Las Vegas, Nevada 89117
    Telephone: (702) 255-1718
    Fax: (702) 255-0871
    E-mail: elj@cjmlv.com

**MEMORANDUM OF POINTS AND AUTHORITIES**

On October 4, 2010, the Court entered the Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief ("Stipulated Consent Judgment") that ended—with the exception of receivership activities—the dispute in the above-captioned matter.  The Stipulated Consent Judgment, however, granted the FTC power to "investigat[e] the accuracy of any of Defendants' Financial Statements upon which the [FTC's] agreement to [the Stipulated Consent Judgment was] expressly premised."  (Stipulated Consent Judgment, § XIV, at 27.)  In aid of this power, the FTC was granted all authority to conduct discovery regarding the subjects of the Stipulated Consent Judgment.  (*Id.* § XIV, at 27–28.)

On March 25, 2014, nearly three-and-one-half years after entry of the Stipulated Consent Judgment, and without any prior notice of its intentions, the FTC filed the instant Motion to

1  Enter Judgment Holding Defendant Jonathan Eborn Liable for Full Monetary Judgment

2  ("Motion".)  Obviously, during the nearly three-and-one-half year intervening period, the FTC

3  engaged in significant and extensive discovery regarding Eborn's compliance with the Stipulated

4  Consent Judgment.   Though, at the present time, the full extent of the FTC's discovery is

5  unknown to Eborn.  Despite the fact that Eborn was aware that the FTC conducted a number of

6  depositions, including deposing Eborn himself, the FTC never provided any clear indication of

7  its suspicions or that it was planning to file its Motion.  Aside from participating in depositions—

8  by being present—and reviewing the accompanying transcripts, the only discovery Eborn has

9  seen to date is that which the FTC has chosen to include as exhibits to its Motion.  The FTC

10  never advised Eborn that he was a target of its "enforcement investigation" or provided Eborn

11  with the specifics of the investigation.  In fact, until March 25, 2014, Eborn was unaware of the

12  exact allegations against him.  Thus, Eborn was taken by surprise by the Motion, and found

13  himself with only seventeen (17) days to respond to the FTC's allegations, which it developed

14  over the course of nearly three-and-one-half years through extensive discovery.

15          Additionally, Eborn's counsel, located in Salt Lake City, Utah needed to affiliate with

16  local counsel in the District of Nevada before entering an appearance or filing any pleadings in

17  the case.  For that reason, on April 10, 2014, Eborn filed an unopposed motion to extend his

18  response time for seven (7) days.  That unopposed motion is still pending before the Court.

19          Since Eborn was unable to obtain an extension by the date his response was due, Eborn

20  filed a timely response on April 11, 2014.  Eborn noted, however, the critical need to finalize

21  witness declarations to provide additional factual support for his response.  In the interim, Eborn

22                                                    3

23

24

has obtained the necessary declarations and has modified his response to attach these declarations as exhibits and by including citations to those exhibits in the response. Moreover, Eborn requests leave to file this amended response within the time period requested by his unopposed motion for an extension of time.

Therefore, Eborn asks that the Court grant leave to file an amended response. The proposed amended response is attached hereto as Exhibit A.

DATED this 18th day of April, 2014

CHRISTENSEN JAMES & MARTIN

By: /s/ Evan L. James
    Evan L. James, Esq.
    Nevada Bar No. 7760
    7440 W. Sahara Avenue
    Las Vegas, Nevada 89117
    Telephone: (702) 255-1718
    Fax: (702) 255-0871
    E-mail: elj@cjmlv.com

## ORDER

**THE COURT HAVING READ** the foregoing Motion for Leave to File Amended Response to Federal Trade Commission's Motion to Enter Judgment Holding Defendant Jonathan Eborn Liable for Full Monetary Judgment filed by Defendant Jonathan Eborn, and good cause appearing therefore, hereby **GRANTS** the same.

**IT IS FURTHER ORDERED** that Defendant Jonathan Eborn's counsel shall file with the Clerk of Court, the Amended Response attached hereto as Exhibit A.

**DATED** this 24th day of April, 2014.

_____
Gloria M. Navarro, Chief Judge
United States District Court

4

# EXHIBIT A

# EXHIBIT A

Evan L. James, Esq. (NSB No. 7760)
CHRISTENSEN JAMES & MARTIN
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
E-mail: elj@cjmlv.com

Brett L. Tolman, Esq. (USB No. 8821) *Admitted Pro Hac Vice (Pending)*
Eric G. Benson, Esq. (USB No. 10414) *Admitted Pro Hac Vice (Pending)*
RAY QUINNEY & NEBEKER P.C.
36 South State Street, #1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Fax: (801) 532-7543
E-mail:  btolman@rqn.com
         ebenson@rqn.com

*Attorneys for Defendant Jonathan Eborn*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:09-cv-01112-GMN-VCF |
| Plaintiff, | **AMENDED RESPONSE TO FEDERAL TRADE COMMISSION'S MOTION TO ENTER JUDGMENT HOLDING DEFENDANT JONATHAN EBORN LIABLE FOR FULL MONETARY JUDGMENT** |
| vs. | |
| INFUSION MEDIA, INC., *et al.*, | |
| Defendants. | **ORAL ARGUMENT REQUESTED** |

Pursuant to Rule 7 of the Federal Rules of Civil Procedure, Defendant Jonathan Eborn ("Eborn") respectfully files this Response to Federal Trade Commission's ("FTC's") Motion to Enter Judgment Holding Defendant Jonathan Eborn Liable for Full Monetary Judgment. This

1

Response is based upon the Memorandum of Points and Authorities, Exhibits and Declarations attached hereto, the papers and pleadings on file herein, and any oral argument presented to the Court at the time of hearing.

DATED this 18th day of April, 2014

CHRISTENSEN JAMES & MARTIN

By: _/s/ Evan L. James_
          Evan L. James, Esq.
          Nevada Bar No. 7760
          7440 W. Sahara Avenue
          Las Vegas, Nevada 89117
          Telephone: (702) 255-1718
          Fax: (702) 255-0871
          E-mail: elj@cjmlv.com

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

On October 4, 2010, the Court entered the Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief ("Stipulated Consent Judgment") that ended— with the exception of receivership activities—the dispute in the above-captioned matter.  The Stipulated Consent Judgment provided:

> 5.    The parties stipulate and agree to this Order, without trial or adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the Complaint to the date of this Order.

> 6.    By entering into this Order, Defendants do not admit to the allegations set forth in the Complaint, other than the jurisdictional facts.

2

7.     Defendants waive all rights to seek judicial review or otherwise challenge or contest the validity of this Order.

(Stipulated Consent Judgment, Dkt. No. 74, at 2.)  Further, and as relevant here, the Stipulated

Consent Judgment stated:

**IT IS FURTHER ORDERED** that judgment is hereby entered in favor of the [FTC] and against Defendants, jointly and severally, in the amount of twenty-nine million, four hundred thousand, three hundred twenty dollars and fifty-seven cents ($29,497,320.57), . . . as equitable monetary relief for consumer injury; *provided, however*, subject to the provisions of Section VIII below, judgment shall be suspended upon Defendants' completion of the requirements stated in Subsections A–C of this Section.

(*Id.* § VI, at 10.)  Section VIII provided:

**RIGHT TO REOPEN**

**IT IS FURTHER ORDERED** that:

A.     The [FTC's] agreement to and the Court's approval of this Order are expressly premised upon the truthfulness, accuracy, and completeness of Defendants' Financial Statements, all of which Defendants assert are truthful, accurate, and complete. Defendants and the [FTC] stipulate that Defendants' Financial Statements provide the basis for the monetary judgment in Section VI of this Order and that the [FTC] has relied on the truthfulness, accuracy, and completeness of Defendants' Financial Statements.

B.     If, upon motion by the [FTC], this Court finds that any Defendant(s) has (1) materially misstated in Defendants' Financial Statements, the value of any asset, (2) made any material misrepresentation or omitted material information concerning his or her financial condition by failing to disclose any asset that should have been disclosed in Defendants' Financial Statements, or (3) made any other material misstatement or omission in Defendants' Financial Statements, the Court shall terminate, as to the offending Defendant(s), the suspension of the monetary judgment entered in Section VI.A.  The Court, without further

3

adjudication, shall enter a modified judgment holding the offending Defendant(s) liable to the [FTC] in the amount of $29,497,320.57 for consumer redress, less any amounts turned over to the FTC pursuant to Section VI of this Order . . . . Upon such reinstatement of the monetary judgment, the Court shall make an express determination that the judgment shall become immediately due and payable by the offending Defendant(s), jointly and severally, and the [FTC] shall be entitled to interest computed from the day of entry of this Order at the rate prescribed under 28 U.S.C. § 1961, as amended, on the unpaid balance. The [FTC] shall be permitted to engage in discovery in aid of execution.

(*Id.* § VIII, at 18–19.) However, the Stipulated Consent Judgment went further, granting the FTC power to "investigat[e] the accuracy of any of Defendants' Financial Statements upon which the [FTC's] agreement to [the Stipulated Consent Judgment was] expressly premised." (*Id.* § XIV, at 27.) In aid of this power, the FTC was granted all authority to conduct discovery regarding the subjects of the Stipulated Consent Judgment. (*Id.* § XIV, at 27–28.) Eborn did, in fact, submit two sworn financial statements, one dated July 13, 2009 and the other June 6, 2010 prior to signing the Stipulated Consent Judgment.

On March 25, 2014, nearly three-and-one-half years after entry of the Stipulated Consent Judgment, and without any prior notice of its intentions, the FTC filed the instant Motion to Enter Judgment Holding Defendant Jonathan Eborn Liable for Full Monetary Judgment ("Motion".) In the Motion, the FTC—wrongfully—alleges that "Eborn omitted material information and made material misrepresentations on [his] sworn financial statements," and requests that the Court enter judgment against Eborn for $26,971,926.50. (Motion at 1.)

4

Obviously, during the nearly three-and-one-half year intervening period, the FTC engaged in significant and extensive discovery regarding Eborn's compliance with the Stipulated Consent Judgment.  Though, at the present time, the full extent of the FTC's discovery is unknown to Eborn.  Eborn was aware that the FTC conducted a number of depositions, including deposing Eborn himself, but the FTC never provided any clear indication of its suspicions or that it was planning to file the instant Motion.  (Eborn Decl., attached hereto as Exhibit 1, ¶ 27.)  Aside from participating in depositions—by being present—and reviewing the accompanying transcripts, the only discovery Eborn has seen to date is that which the FTC has chosen to include as exhibits to the Motion.  (*Id.* ¶ 28.)  Thus, Eborn was taken by surprise by the Motion, and found himself with only seventeen (17) days to respond to the FTC's allegations, which it developed over the course of nearly three-and-one-half years through extensive discovery.  (*Id.* ¶ 29.)

Despite the inequity of the situation, Eborn responds to the FTC's allegations below, illustrating through the use of the limited evidentiary resources available—*i.e.*, deposition transcripts and the exhibits attached to the FTC's Motion—that he did not omit any material information or make any material misrepresentations on his sworn financial statements.  Eborn's response shows that the FTC has failed to satisfy its burden of establishing that Eborn's sworn financial statements contained any material omission or misrepresentation.  As such, the Court should deny the FTC's Motion.

/ / /

/ / /

## II.

### RESPONSE TO FTC'S STATEMENT OF FACTS

The FTC's Motion alleges that Eborn (1) "failed to disclose significant sums of money, including $61,519 in cash"; (2) "misrepresented his ownership and control of assets, including ownership stakes in companies"; (3) "misrepresented the nature of payments to him, through which he hid at least $274,828.80"; and (4) "failed to identify assets, such as newly acquired high-value property totaling more than $33,100."  (Motion at 2.)  Despite nearly four years of targeting and investigating Mr. Eborn, and faced with evidence contradicting its own allegations contained in the Motion, the FTC now seeks to hold Mr. Eborn liable for the nearly $27 million loss figure—an amount not proven but instead agreed to in the Stipulated Consent Judgment—based on a handful of minor accounting or other disagreements, of which the FTC was largely aware of at the time of entering into the Stipulated Consent Judgment, which certainly do not amount to any "material" omissions or misrepresentations.  Each of these categories of factual allegations will be discussed in turn.

### A.    ALLEGED FAILURE TO DISCLOSE SIGNIFICANT SUMS OF MONEY

1.    EBORN DEPOSITS $23,200 AFTER SUBMITTING HIS JULY 13, 2009 FINANCIAL STATEMENT

The FTC alleges that immediately after submitting the July 13, 2009 financial statement, "Eborn opened a new bank account at Home Savings Bank and deposited $23,200 in cash in three installments over eight days."  (Motion at 2.)  The bank statements obtained by the FTC

speak for themselves.  (*Id.*, at Exs. 4–5.)  From the alleged fact that Eborn deposited $23,200 into

the bank *after* submitting the July 13, 2009 financial statement, the FTC asserts:

> Eborn recently testified that the $23,200 in cash deposits were loan
> proceeds.    But, this *post hoc* justification does not withstand
> scrutiny.    Eborn testified at a deposition that he has never repaid
> the "loan."    Therefore, if it were in fact a loan, he should have
> listed it on his 2010 Statement.  On his 2010 Statement, however,
> he lists only the loan from PDR, which, as discussed below, did
> not loan him this cash.  Although he suggests that the loan is from
> family, he further testified that he does not owe his family any
> money *and* that he never repaid the loan.    Additionally, when
> asked, he could not identify a single individual that could have
> made the loan to him.

(*Id.* at 3 (internal citations omitted).)

The FTC has mischaracterized evidence and draws conclusions that are not supported by

the evidence.  On June 23, 2009, this Court entered a TRO against all defendants in the case,

including Eborn, and the majority of Eborn's assets were frozen.  (Dkt. No. 12; Eborn Decl., Ex.

1, ¶ 3.)  At the time of the TRO, Eborn possessed cash which he understood was subject to the

asset freeze pursuant to the Court's TRO.  (Eborn Decl., Ex. 1, ¶ 4.)  Less than a month after the

TRO issued, on July 13, 2009, Eborn submitted a sworn financial statement.  (Gov't Motion, Ex.

1.)  In the 2009 Statement, Eborn disclosed $42,400 in cash—which was the amount of cash

Eborn personally possessed at the time he signed the statement and represented the amount he

understood to be frozen at the time.  (Motion Ex. 1, at 7, 15; Eborn Decl., Ex.1, ¶ 6.)  As

settlement negotiations progressed in the case, and after speaking with counsel, Eborn was

informed and understood that he need not surrender those particular fungible bills, but that the

amount of cash he possessed at the time of the entry of the TRO would need to eventually be

7

accounted for, if in the end a final judgment were entered or if a settlement with the FTC were reached. (Eborn Decl., Ex.1, ¶ 7.) Thus, after disclosing this cash on his 2009 Statement,[1] Eborn used some of the money to pay for personal expenses and deposited some of the money into bank accounts. (*Id.* ¶ 11.) It is Eborn's recollection that the $23,200 of deposits at issue were part of the $42,400 cash he had on hand when the TRO was entered and which he disclosed in his financial statements. (*Id.*) A little over a year after the entry of the TRO, Eborn entered into the Stipulated Consent Judgment with the FTC. (Dkt. No. 74.) As part of the Stipulated Consent Judgment, Eborn was required to surrender assets and monies already in possession of the receiver. (*See* Stipulated Consent Judgment, § VI.) Additionally, the agreement required Eborn to pay an additional $78,000 out-of-pocket to cover past tax liabilities. (*Id.* § VII.) The Stipulated Consent Judgment did not specify that the $78,000 payment included the $42,400 cash Eborn possessed at the time the TRO was entered, but through settlement negotiations, Eborn understood that this $78,000 payment would settle all claims, and that the $42,400 in cash would be considered part of the settlement amount. (Eborn Decl., Ex. 1, ¶ 8.) Further, Eborn understood that the Stipulated Consent Judgment superseded any prior seizure order and that his payment of $78,000—along with his surrendering all property previously seized and in the receiver's possession—settled the matter completely. (*Id.* ¶ 9.)

In its Motion, the FTC claims that the above-described $61,519 in cash "should have been frozen and turned-over to the FTC," (Motion at 11,) yet the documents related to the case

---

[1] Understanding that the cash in his possession at the time of the entry of the TRO would eventually have to be accounted for at the time of an eventual settlement, Eborn once again listed the $42,400 in cash in his 2010 financial statement. (*See* Motion, Ex. 2, at 13; Eborn Decl., Ex. 1, ¶ 12.)

never specify that amount of cash as "frozen" or specific directions to surrender the monies to the Receiver.[2]  Instead, a more logical explanation is that any amounts of cash in Eborn's possession at the time of the TRO, or the $42,400 claimed on Eborn's 2009 and 2010 financial statements, would need to be reconciled at the time of settlement.  From the history outlined above, it is clear that the FTC mischaracterizes the evidence and, more importantly, adduces no facts to show that Eborn knowingly violated a court order or made material omissions or misrepresentations in his financial statements.  In its Motion, the FTC—without engaging in any sort of sourcing analysis—speculates that Eborn's deposits over many months now seem suspicious and therefore the deposits must somehow constitute a violation of the Stipulated Consent Judgment.   However, if speculation is allowed on one side, the alternative question is also worth posing here: If Eborn intended to conceal large amounts of cash from the Government before signing the Stipulated Consent Judgment, why would he disclose so much of it on two separate disclosure forms while the case was pending against him?

2.      EBORN DEPOSITS $38,319 BETWEEN ENTRY OF THE TRO AND NOVEMBER 2010

Similarly, the FTC alleges that "Eborn deposited an additional $38,319 in cash between the date of the Temporary Restraining Order and November 2010."  (Motion at 4.)  The FTC continues by alleging that "Eborn cannot account for these funds."  (*Id.*)  In the next breath, the FTC states that in his deposition, "Eborn stated that they were 'loans' or 'gifts,' from whom he does not know, or were deposits from the $42,400 in cash that he disclosed on the 2009

---

[2]   Around this same time, at the Receiver's request, Eborn did turn over gold, silver and a cashier's check to his attorneys for safekeeping during the pendency of the case.  (Eborn Decl., Ex. 1, ¶ 10.)

Statement." (*Id.*)  However, as above, the FTC takes these allegations and makes an unsupported leap:

> The "loan" explanation is incredible—despite the size of the deposits, he does not know who loaned him the money and he never disclosed the loans on his 2010 Statement.  The gift explanation is false.  Inconceivably, he does not know who gave him these substantial gifts.  If Eborn was spending frozen cash, he is claiming to have knowingly and willfully acted in contempt of this Court's orders, an act that could have both civil and criminal consequences.  Furthermore, Eborn claims his alleged contempt accounts for only some of the deposits.

(*Id.* (internal citations omitted).)

Again, the FTC has mischaracterized evidence and draws conclusions that are not supported by the evidence.  Throughout the tumultuous time period during the pendency of the underlying case, Eborn received financial support from family and friends on numerous occasions.  (Eborn Decl., Ex. 1, ¶ 13.)  While many of these cash infusions were outright gifts, others were informal "loans" from friends that would likely have to be repaid at some point, albeit on an informal schedule.  (*Id.* ¶ 14.)  In any event, Eborn never understood that he was required to list post-TRO gifts or informal loans as assets on his disclosure forms as these monies were used to enable the Eborn family to survive.  (*Id.* ¶ 15.)  In reality, much of this money came in and was spent quickly thereafter on Eborn's family's expenses.  (*Id.* ¶ 18.)  The rest of the money was deposited in banks over time.  (*Id.* ¶ 18.)  As explained above, some of this $38,319 was likely disclosed as part of the $42,400 listed on Eborn's 2009 and 2010 statements.  (*Id.* ¶ 19.)  The balance likely came from family and friends to support the Eborns during the difficult time they faced.  (*Id.*)  Now, five years after-the-fact and without having the benefit of extensive

10

bank documentation, Eborn cannot remember the source and other details regarding each transaction and which deposits were disclosed—as part of the reported $42,400 in cash—and which were gifts and therefore not disclosed.  (*Id.* ¶ 20.)  Whatever the case, the FTC should bear the burden of sourcing this money and proving that Eborn actively concealed cash that he possessed at the time the TRO was entered, and then surreptitiously deposited the money to avoid disclosing it to the FTC on his financial statements—while at the same time he inexplicably disclosed $42,400 in cash on both his 2009 and 2010 statements.   Such a speculative leap defies common sense and certainly does not prove that Eborn either omitted or misrepresented facts regarding cash assets on his financial disclosures, and certainly does not justify holding Eborn solely responsible for a nearly $27 million dollar judgment.

**B.      ALLEGED MISREPRESENTATION OF OWNERSHIP IN OR CONTROL OF COMPANIES**

1.      EBORN'S INTEREST IN AUGUSTA CAPITAL

The FTC alleges that "Eborn hid his ability to tap Augusta Capital's corporate assets by falsely claiming to be the 'Retail Accounts Manager' when he was actually an officer and principal."  (Motion at 5.)  To support this allegation, the FTC makes three assertions.  First, the FTC states that "Augusta Capital did not have 'retail accounts' for him to manage."   (*Id.*)  Second, the FTC states that "aside from self-serving testimony, all evidence shows that [Eborn] was an officer and principal."  (*Id.*)  Supposedly, the evidence supporting this is that "[t]he FTC obtained a corporate resolution that Augusta Capital submitted to a bank listing Eborn as an officer," and "a signed letter seeking health insurance for Augusta Capital employees indicating

11

1  that Eborn was a principal." (*Id.*)  Finally, the FTC states that "the company paid [Eborn] like an

2  officer or principal." (*Id.*)

3       Here, without evidence in support and ignoring evidence to the contrary, the FTC alleges

4  that Eborn was an officer or principal in Augusta Capital, that the company had sufficient

5  corporate assets which could be tapped in order to offer a larger settlement figure to the FTC,

6  and that Eborn concealed these facts from the FTC in his declarations to hide, or at least

7  minimize, his net worth.

8       Again, the FTC's conclusions that "*all* evidence shows that [Eborn] was an officer and

9  principal" in Augusta Capital is not supported by the facts in the record.  (Motion at 5.)  In his

10  deposition, Pace Mannion, president of Augusta Capital and presumably the person in the best

11  position to know whether Eborn actually possessed an ownership interest in the company,

12  directly contradicted the FTC's theory that Eborn was an officer because he was listed on a

13  corporate resolution.  Mr. Mannion stated that Eborn's name was simply put on the corporate

14  documents as an oversight, and that Eborn really had no management role in the company:

15  "Well, it looks like we [included Eborn's name on the corporate documents] to open the bank

16  account because we needed two signers but I don't . . . I don't think [Eborn] was ever part of the

17  corp." (Motion, Ex. 8, at 55: 5-8.)

18       Regarding the letter which sought health insurance for company employees purportedly

19  identifying Eborn as a principal of Augusta Capital, Mannion explained that although the letter

20  appeared to list both Mannion and Eborn as owners, it "was . . . typed out by somebody who

21

22

23

24

didn't know" the company's corporate structure, and that the letter "wasn't sent by Mannion or Eborn. (*Id.* at 57:7-10.)

These two documents, which were easily dismissed by Augusta Capital's president, are incapable of proving that Eborn acted as an "officer or principal" of Augusta Capital, especially given the fact that Mr. Mannion did not recall Eborn ever being part of the company's corporate structure. The FTC has not even presented official corporate documents, filed with the State that would show the officers and principals of the company. Even assuming *arguendo* that some evidence exists to show Eborn had some ownership in the company, the FTC would still fail to demonstrate that the company had significant corporate assets and that Eborn could freely tap into those resources at any time. The FTC would also have to deal with the fact that Eborn disclosed numerous other companies he had interests, calling into question why he would only conceal Augusta Capital from the FTC in his financial disclosures in order to hide his wealth, particularly where there is no evidence whether Augusta Capital was even valuable. Notably, despite reviewing all of Augusta Capital's financials and the Eborn's financials, the FTC provides no evidence of Eborn relying on Augusta Capital as a source of revenue—that is because it was never Eborn's company.

2.    Eborn's Involvement with Link Media

Similarly, the FTC alleges that Eborn "falsely claimed to be an 'Account Executive' with Link Media" when, "[i]n reality, he was a principal." (Motion at 6.) The evidence that the FTC points to is that "Eborn did not oversee any accounts," he "received 30% of Link Media's profits" while "Clint Arnell, Link Media's putative owner, received just 10%," and "[i]t is . . .

incredible that Arnell, a former Infusion Media employee and Eborn subordinate, was the true Link Media principal when Link Media was merely a continuation of Arnell's business role at Infusion Media." (*Id.*)  With regards to Link Media, the FTC offers no reasonable evidence that Eborn was an officer or a principal other than characterizing certain aspects of Eborn's involvement with the company as "incredible" in the FTC's subjective eyes.

Eborn actually did very little work with Link Media.  (Eborn Decl., Ex. 1, ¶ 23; Miller Decl., attached hereto as Exhibit 2, ¶ 5.)  Eborn's co-defendant McClain Miller ended up working much more extensively with Link Media than did Eborn.  (Eborn Decl., Ex. 1, ¶ 23; Miller Decl., Ex. 2, ¶ 5.)  Whatever the case, the FTC presents no evidence that Eborn owned or controlled Link Media and that he actively shielded company assets from the FTC in order to extract a more favorable settlement for himself in 2010.  Further, quibbling about whether Eborn really acted as an "account executive" at Link or in some other capacity, such as a consultant, is largely an exercise in futility, as any determination of the issue would not be material and thus would not be subject to the provisions of the Stipulated Consent Judgment.

C.    **ALLEGED MISREPRESENTATION OF THE NATURE AND AMOUNT OF PAYMENTS MADE TO EBORN**

1.    EBORN'S PAYMENTS FROM AUGUSTA CAPITAL

The FTC alleges that "Augusta Capital and a related entity transferred $145,500 to Eborn, all of which Eborn deposited shortly after signing the 2010 Statement."  (Motion at 6.) Further, the FTC states: "Curiously, Eborn falsely reported earning $44,300 from Augusta

Capital between January 1 and June 6, 2010," even though "Augusta Capital did not transfer any money to Eborn until June 9, 2010." (*Id.*)

Here, curiously, the FTC accuses Eborn of both underreporting his income from Augusta Capital and also of overreporting his income around the same time. As the FTC points out in its Motion, Eborn reported earning $44,300 from Augusta Capital between January 1 and June 6, 2010. (Eborn Decl., Ex. 1, ¶ 21.) In an abundance of caution, Eborn reported this number on his 2010 financial statement—signed halfway through the year in June—based on his projected income that year. (*Id.*) Eborn eventually earned around $95,000 from Augusta Capital that year. (*Id.*) In his 2010 declaration, Eborn estimated a total monthly income of $9,100, or $109,200 for the year, yet that figure would prove to be ambitious that year as Eborn eventually only earned $95,000 that year—or approximately $7,916 per month. (Motion, Ex. 2, at 3.) Overestimating his income in this fashion is hardly suggestive of someone intending to defraud the FTC by falsifying financial records through *underreporting* income and assets.

In 2010, Eborn recalls receiving around $140,000 or so from Augusta Capital—he is not certain of the exact number without having access to relevant documents and bank records. (Eborn Decl., Ex. 1, ¶ 22.) As discussed above, of the $140,000 approximately $95,000 accounts for salary Eborn received for his work at Augusta Capital that year. (*Id.*) The balance of the Augusta money was loaned to Eborn in order for Eborn to resolve the underlying case and to pay $78,000 to the FTC as part of the Stipulated Judgment Order. (*Id.*) Pace Mannion testified that this money was a loan to enable Eborn to settle with the FTC in 2010, and Mannion further states

1    that Eborn has been paying back the loan over time by referring business to Mannion's company.

2    (*See* Motion Ex. 8, at 95:4-96:15.)

3    Along those same lines, the FTC accuses Eborn of waiting a few extra days in June 2010

4    before depositing checks into his bank account in order to avoid disclosing the money on his

5    2010 financial statement.   (Motion at 9.)   Once again, this allegation flies in the face of

6    conventional wisdom, considering the fact that Eborn reported $44,300 of income on his 2010

7    financial statement and then deposited a check from that reported employer, Augusta Capital,

8    into his bank account a few days later.   Thus, the government seems to merely allege that Eborn

9    did not deposit a check from Augusta Capital on the same day that he received the check—

10   hardly a material violation, much less one worthy of triggering a $26,971,926.50 judgment.

11   2.   EBORN'S LOANS FROM PDR BILLING

12   The FTC alleges that "Eborn misrepresented the nature of a dozen large transfers totaling

13   $292,628.83 from PDR, Infusion Media's former payroll company." (Motion at 7.)   The FTC

14   asserts that "[a]lthough characterized as 'loans,' PDR was holding Eborn's money during the

15   pendency of the case and distributing it whenever Eborn asked." (*Id.*)   Even further, the FTC

16   states:

17              There was no contemporaneous loan agreement documenting these
                transfers.   Ultimately, Eborn signed a promissory note for

18              $196,700 on August 30, 2010, but only after all of the transfers.
                The note is a sham document.   PDR has made no attempts to

19              collect on it.   Furthermore, the final two payments, totaling
                $40,928.83, were made less than three weeks prior to when Eborn

20              signed the alleged promissory note.   But, neither Eborn nor PDR
                included them in the promissory note.   Additionally, it inexplicably

21              excluded the July 2, 2009 payment, the October 30, 2009 payment,

22                                                  16

23

24

and the January 19, 2010 payment.  All told, the promissory note
failed to include $95,928.83 in transfers to Eborn.

(*Id.* (internal citations and footnotes omitted).)  Thus, the FTC asserts that "[a]lthough Eborn

listed a loan from PDR on his 2010 Statement, he failed to disclose more than half of the total

amount he had received as of the 2010 Statement."  (*Id.*)

     Other than hyperbole, the FTC provides absolutely no evidence that the money provided

to Eborn by PDR Billing was Eborn's money that he had parked with PDR Billing to conceal

detection, and not a loan.  First, it is the FTC that bears the burden of establishing that Eborn

violated the Stipulated Consent Judgment.  To satisfy that burden, the FTC must provide some

evidence—not just its conclusory statement that the promissory "note is a sham document,"

(Motion at 8)—that the money provided to Eborn from PDR Billing was, in reality, Eborn's

money parked with PDR Billing.  The FTC can, and on information and belief, has accessed

PDR Billing's financial and banking records, along with those from Eborn and Infusion Media.

With this information at its fingertips, it is surprising that the FTC has provided no actual

evidence that PDR Billing was just essentially laundering Eborn's own money back to him

during the pendency of the underlying case.  Missing this crucial piece of evidence renders the

FTC incapable of supporting its position and asking this Court to hold Eborn responsible for a

nearly $27 million dollar judgment based solely upon the FTC's self-serving statement that the

promissory note was a sham.

     Second, all of the evidence points to the conclusion that the PDR Billing transfers to

Eborn were unsecured loans, in the truest sense of the term.  Eborn represented the PDR Billing

transfers as a loan on the June 6, 2010 disclosure.  (*Id.*)  Moreover, Jeff Benson, the managing

member of PDR Billing, stated that the PDR Billing transfers to Eborn were loans in the very

declaration the FTC relies on as Exhibit 12 to its Motion.  (Motion, Ex. 12, at ¶¶ 1, 17–28.)  And,

despite the FTC's attempt to make much of the fact that Eborn only signed a promissory note

after all of the PDR Billing transfers, the explanation for the structure of the transaction is

explained clearly by Jeff Benson.  Jeff Benson stated: "Loans to third party businesses or their

owners who are clients of ours are fairly commonplace.  PDR Billing and now Shutter Lending

loans money on a daily basis."  (*Id.* ¶ 21.)  PDR Billing and Jeff Benson "continued to believe

that [they] would be paid back and continued to loan money to Mr. Eborn personally until about

April 2010 when [they] realized, based on a better understanding of the full nature of the issues

regarding the Temporary Injunction that the issues Infusion and Mr. Eborn faced m[ight] be

more permanent."  (*Id.*  ¶ 22.)   In light of this, Jeff Benson expressed his concerns over

repayment to Eborn, and "pushed to enter into a firmer loan position by having the loan

secured," but Jeff Benson "learn[ed] that security did not exist due to the Temporary Injunction."

(*Id.* ¶ 23.)  Thereafter, Jeff Benson "negotiated to have an unsecured promissory note evidencing

the $197,700.00 loaned to Mr. Eborn."  (*Id.* ¶ 24.)  The promissory note matures on October 31,

2014, and Jeff Benson still "fully expect[s] and anticipate[s] Mr. Eborn to fulfill the terms of the

note and payment of the note and interest by the Maturity date."  (*Id.* ¶ 28.)

Finally, regarding the difference between the $197,700 promissory note in Eborn's name

and the $292,628.83 disbursed by PDR Billing during this timeframe, it is explained by the fact

that PDR Billing transferred money for legal fees to both Eborn and to his co-defendant McClain

1  Miller in order for them to fund their defense in the underlying case.  (Eborn Decl., Ex. 1, ¶ 17;

2  Miller Decl., Ex. 2, ¶ 4.)   At some point prior to signing the promissory note, those fees

3  advanced by PDR Billing for legal fees which were reserved for Miller's defense were deducted

4  from Eborn's loan.  (Eborn Decl., Ex. 1, ¶ 17; Miller Decl., Ex. 2, ¶ 4.)  Thus, the final amount

5  owing on Eborn's promissory note is significantly less than the total amount disbursed by PDR

6  Billing throughout this time period.   (Eborn Decl., Ex. 1, ¶ 17.)   In order to support its

7  allegations that all PDR Billing transfers to Eborn were really just a "sham" for Eborn to hide

8  wealth, the FTC must show sufficient evidence in support of its allegations.  Yet the FTC fails to

9  make this showing and its conclusory allegations fail to show that Eborn parked any monies with

10 PDR Billing during the pendency of this case and asked for secretive disbursements through

11 PDR Billing in order to avoid listing the monies as assets on his disclosure forms.

12         3.      EBORN'S INCOME ON THE JUNE 6, 2010 FINANCIAL STATEMENT

13         The FTC alleges that "Eborn hid his true income by fabricating his average monthly

14 income on his 2010 Statement." (Motion at 9.)  The FTC asserts that despite claiming "$9,100 in

15 monthly income," "including the PDR transfers, [Eborn] had been receiving and spending more

16 than twice his disclosed income."  (*Id.*)

17         First, as discussed above, the FTC has no evidence that the PDR Billing transfers are

18 anything other than loans—the only evidence on the issue comes directly from the owner of PDR

19 and supports only the conclusion that they were indeed loans.  The FTC has presented absolutely

20 no evidence that the PDR Billing transfers should have been included as income.  As a fact of

21 common reality in the United States' consumer culture, it is hardly rare for an individual to

22                                            19

23

24

spend more than that individual's income each month.  With the ready availability of consumer and other credit, individuals are able to spend potentially far more than their actual income during any given period of time.  Here, Eborn is no different, and in fact it is admitted that Eborn received substantial monetary gifts and loans during the relevant period, allowing him to spend more money than he made in income during the relevant period.  (Eborn Decl., Ex. 1, ¶ 13-14.)

Second, apart from the fact that the FTC has improperly conflated monies spent by Eborn with Eborn's income, it is difficult to see how any potential misrepresentation by Eborn could have been material.  In footnote 19, the FTC states that Eborn had not made any income up to the June 6, 2010 disclosure.  Despite this, Eborn claimed $9,100 in monthly income.  (Motion at 9 & n.19.)   As explained above, over-disclosure of assets hardly seems to be a material misrepresentation.  In reality, this disclosure was an estimate of the income that Eborn expected to bring in during 2010 and, out of an abundance of caution, he over-disclosed.  (Eborn Decl., Ex. 1, ¶ 21.)  In fact, Eborn's actual income for 2010 was $95,000, equating to $7,916 per month of income, a number significantly less than indicated by Eborn in the June 6, 2010 disclosure.  (*Id*.)  If Eborn was really trying to hide wealth and income streams from the FTC, why would he over-disclose his income?   Again, the FTC's allegations rest on improper assumptions, insufficient to satisfy its burden—here, the assumption that Eborn could only have spent as much as he earned, despite knowing that Eborn received additional non-income money during this tumultuous period in his life.

/ / /

/ / /

20

**D.      ALLEGED FAILURE TO IDENTIFY REAL AND PERSONAL PROPERTY**

      1.      EBORN'S ADDRESS DISCLOSURE

The FTC alleges that "Eborn hid his ineligibility for a homestead exemption by falsely claiming his Sandy, UT home as his current address even though he had moved to Draper, UT eight months before signing the 2010 Statement."  (Motion at 9.)  The FTC asserts that Eborn "estimated that the Sandy, UT home had between $42,948 and $3,000 in equity."  (*Id.* at 10.) Although "[t]he Utah homestead exemption would have protected $40,000 if he lived in the home," the FTC argues that "[a]fter moving out of the home, Eborn was limited to the $10,000 exemption for a non-primary residence."  (*Id.*)

In fact, the Sandy, UT home was solely owned by Eborn's wife.  (Eborn Decl., Ex.1, ¶ 25.)  Early on in the process, the FTC communicated to Eborn that it was not interested in the Sandy, UT home, regardless of its value.  (*Id.*)  This was likely the case because even if the Sandy, UT home was to be sold, there was not likely to be any net recovery for the FTC after considering the cost of selling the home, the home's increasing mortgage balance due to Eborn's inability to make the payments, and the decreasing value of the home due to the poor real estate market at that time.  (*Id.*)  Moreover, Eborn does not recall ever having knowledge of a potential homestead exemption or attempting to utilize its provisions.  (*Id.*)

Regardless, it is important to note the misleading nature of the FTC's statement: "After moving out of the [Sandy, UT] home, Eborn was limited to the $10,000 exemption for a non-primary residence."  (Motion at 10.)  The FTC compares this to the $40,000 exemption for a residence, and asserts that "[b]ecause the FTC did not know that [Eborn] had moved, the home

1    appeared to have no or little value." (*Id.*)  First, the FTC provides no evidence that Eborn took

2    advantage of *any* homestead exemption or that he even knew it was available to him.  As the

3    moving party, this is the FTC's burden.  The FTC's failure to establish this baseline fact is

4    dispositive because if Eborn did not get the benefit of any homestead exemption, then this *could*

5    *not* have been a material misstatement and it could not have influenced the FTC's decision.[3]

6          Second, even if Eborn did receive the advantage of a homestead exemption, on the face

7    of the FTC's motion it would have been immaterial whether the Sandy, UT home was a primary

8    or non-primary residence.  Although the FTC attempts to juxtapose the estimated values of the

9    Sandy, UT home in the July 13, 2009 and June 6, 2010 disclosures, (*id.*), the only relevant value

10   is the June 6, 2010 disclosure.  The June 6, 2010 disclosure is the only relevant disclosure

11   because the FTC concedes that Eborn did not move into the Draper, UT home until October

12   2009, *after* the July 13, 2009 disclosure.  (*Id.* at 9.)  Thus, the only potential misrepresentation—

13   the FTC does not assert that Eborn's estimates of the Sandy, UT home's value was

14   misrepresented—is with respect to the June 6, 2010 disclosure.[4]  As of June 6, 2010 the value of

15   Eborn's equity in the Sandy, UT home—which the FTC does not dispute—was only $3,000.  (*Id.*

16   at 10.)   And, by the FTC's own admission, *both* the homestead exemption for a primary

17

18   [3] Because the FTC failed to produce any evidence that Eborn received the benefit of a homestead exemption, it is

19   unnecessary for Eborn to consider whether a homestead exemption would have even properly applied in his situation.

20   [4] Likewise, even if the Sandy, UT home had been worth much more in 2009, the reality is that for purposes of considering the FTC's reasons for entering the Stipulated Consent Judgment the FTC would not have been concerned with the prior value of the home.  Only the June 6, 2010 Sandy, UT home value could be material to the

21   FTC's decision to enter the Stipulated Consent Judgment.

22                                        22

23

24

residence ($40,000) and a non-primary residence ($10,000) would have prevented the FTC from being able to extract any value from the Sandy, UT home.  (*Id.*)  Therefore, the status of the Sandy, UT home as Eborn's primary or non-primary residence could not have been material to the FTC's decision.

Finally, the mere fact that Eborn was not primarily living in the Sandy, UT home after October 2009 is immaterial.  From a financial perspective, Eborn entered into a long-term lease option on the Draper, UT home.  (*Id.* at 9.)  As such, Eborn possessed no equity in the Draper, UT home that could be extracted by the FTC.  So, the only other importance as to where Eborn lived would be so that the FTC could contact him.  The FTC has not made any allegation that it has been unable to contact Eborn, nor that Eborn has been uncooperative.  In fact, the FTC has been in contact with Eborn throughout the entire period.[5]  (Eborn Decl., Ex. 1, ¶ 26.)  Eborn picked up the mail at the Sandy, UT home nearly every day, and spent time at that home during the period.  (*Id.*)  Prior to his submission of the April 2011 compliance report, Eborn had always planned to move back into the Sandy, UT home.  (*Id.*)  Eborn moved to the Draper, UT home because he and his family were receiving threatening phone calls in the wake of the FTC lawsuit.  (*Id.*)  The plan was to eventually move back into the Sandy, UT property, but the home ended up in foreclosure.  (*Id.*)  Despite all this, the location of Eborn's residence—outside the potential for a financial recovery—cannot be said to have been material to the FTC's decision to enter the Stipulated Consent Judgment.

---

[5]  In fact, on information and belief, Eborn is the only defendant involved in the case who has consistently filed his required disclosures in the years following the signing of the Stipulated Consent Judgment.  Tellingly, the FTC makes no allegations in its Motion about Eborn's non-compliance with the Order in the years after its execution.

2. EBORN'S $33,100 OF PERSONAL PROPERTY

The FTC alleges that Eborn "omitted $33,100 of personal property from his 2010 Statement." (Motion at 10.) The FTC asserts that "[w]hen Eborn moved to the Draper, UT house in October 2009, he purchased $20,000 worth of home furnishings," and "Eborn acquired a $13,100 piano after he signed the 2009 Statement." (*Id.*)

Eborn did not disclose this personal property in his 2010 statement for a number of reasons, including the fact that this property was purchased with loan proceeds and thus Eborn did not consider it to be an asset requiring disclosure. (Eborn Decl., Ex. 1, ¶ 24.)

Further, during this time Eborn understood that personal property was exempt from the TRO. (*Id.*) Such an exemption was consistent with the receiver's actions after the TRO was entered when the receiver allowed Eborn to remove personal music equipment and instruments from Infusion Media's offices and indicated that the personal property was exempt from the seizure order. (*Id.*) Based on these events, Eborn did not disclose the furniture and other miscellaneous items of personal property on his 2010 financial statement. (*Id.*) Of course, the value of personal property is often subjective and difficult to accurately value. It becomes even more difficult to value—and to consider as an asset—when it is paid for with borrowed money. Thus, for the FTC to allege that Eborn actively concealed the true value of his personal property in order to hide wealth and to advance a more favorable settlement with the FTC seems to grasp at straws. This allegation is not significant and should not be given significant consideration by the Court. Even if the FTC were able to prove this point regarding personal property, which it has not, considering the totality of the circumstances in this case, enforcement of a

1   $26,971,926.50 judgment against Eborn because he failed to list and value a few pieces of

2   furniture and a piano—bought with borrowed money—would be manifestly unjust and violate

3   the spirit of the Stipulated Consent Judgment.

4                                              **III.**

5                                           **ARGUMENT**

6   **THE FTC HAS FAILED TO SATISFY ITS BURDEN OF PROVING THAT
    EBORN'S FINANCIAL STATEMENTS CONTAINED MATERIAL OMISSIONS**
7   **OR MISREPRESENTATIONS**

8           It appears as though the FTC argues that the "without further adjudication" provision of

9   the Stipulated Consent Judgment requires the Court to automatically enter judgment against

10  Eborn.  That is not the case.  The relevant provision states:

11              If, upon motion by the [FTC], *this Court finds* that any
                Defendant(s) has (1) materially misstated in Defendants' Financial
12              Statements, the value of any asset, (2) made any material
                misrepresentation or omitted material information concerning his
13              or her financial condition by failing to disclose any asset that
                should have been disclosed in Defendants' Financial Statements,
14              or (3) made any other material misstatement or omission in
                Defendants' Financial Statements, *the Court shall terminate*, as to
15              the offending Defendant(s), the suspension of the monetary
                judgment entered in Section VI.A.  *The Court, without further*
16              *adjudication, shall enter a modified judgment* holding the
                offending Defendant(s) liable to the [FTC] in the amount of
17              $29,497,320.57 for consumer redress, less any amounts turned
                over to the FTC pursuant to Section VI of this Order . . . .

18
    (Stipulated Consent Judgment, § VIII, at 18–19 (emphasis added).)  It is clear that the Stipulated
19
    Consent Judgment contemplates that the FTC must bear some burden of proof.  That is, the FTC
20
    must prove, and the Court must find, that Eborn's sworn financial statements included *material*
21

22                                              25

23

24

1    omissions or misrepresentations.  It is only after the FTC has satisfied its burden of proof, and

2    the Court has made requisite factual findings, that "without further adjudication" the Court

3    should enter judgment against Eborn.

4            The FTC is trying to get the cart before the horse in this instance.  The FTC has brought a

5    motion before the Court containing sparse, often contradicted, evidence and asks the Court to

6    accept that evidence as true and enter an enormous judgment against Eborn based upon very

7    small accounting disagreements.  At best this is improper; at worst it would evince a marked

8    departure from Due Process guarantees.  Regardless, as demonstrated above in Eborn's detailed

9    response to the FTC's factual allegations, the FTC has failed to satisfy its burden of proving that

10   Eborn's sworn financial statements contained material omissions or misrepresentations.  The

11   FTC completely ignores the evidence contrary to its tenuous theories, choosing instead to rely on

12   hyperbole and its own unsupported conclusions.  And, the fact that the FTC engaged in virtually

13   unlimited discovery for nearly three-and-a-half years should inform the Court of the one-sided

14   nature of the FTC's Motion and requested relief which is, in reality, just the culmination of a

15   long and tortured witch hunt.  Imposing a nearly $27 million dollar judgment against Eborn

16   based on the FTC's unsupported allegations is improper and if entered under these circumstances

17   would amount to a miscarriage of justice.

18           Given the paucity of the FTC's evidence and the potential gravity of the consequences for

19   non-compliance with the Stipulated Consent Judgment, Eborn requests oral argument before the

20   Court on the issues.

21   / / /

22                                                  26

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## IV.

## CONCLUSION

For the foregoing reasons, the Court should deny the FTC's Motion.

DATED this 18th day of April, 2014

CHRISTENSEN JAMES & MARTIN

By: /s/ Evan L. James
             Evan L. James, Esq.
             Nevada Bar No. 7760
             7440 W. Sahara Avenue
             Las Vegas, Nevada 89117
             Telephone: (702) 255-1718
             Fax: (702) 255-0871
             E-mail: elj@cjmlv.com

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on the 18th of April, 2014, I electronically filed the foregoing

3  **AMENDED RESPONSE TO FEDERAL TRADE COMMISSION'S MOTION TO**

4  **ENTER JUDGMENT HOLDING DEFENDANT JONATHAN EBORN LIABLE FOR**

5  **FULL MONETARY JUDGMENT** with the Clerk of the Court using the CM/ECF system

6  which sent notification to the following:

7      Benjamin Theisman                         Ogonna Atamoh
       Daniel O. Hanks                             Richard F. Holley
8      Kathleen Benway                           COTTON DRIGGS WALCH HOLLEY,
       Michael J. Davis                              ET AL.
9      Katherine Johnson                          400 S. Fourth Street
       FEDERAL TRADE COMMISSION     Third Floor
10     600 Pennsylvania Avenue, NW        Las Vegas, NV 89101
       Washington, D.C. 20580                 oatamoh@nevadafirm.com
11     btheisman@ftc.gov                         rholley@nevadafirm.com
       dhanks@ftc.gov                             *Attorneys for Defendants*
12     kbenway@ftc.gov
       mdavis@ftc.gov
13     kjohnson3@ftc.gov
       *Attorneys for Plaintiff*
14
       Blaine T. Welsh
15     U.S. ATTORNEY'S OFFICE
       DISTRICT OF NEVADA
16     333 Las Vegas Blvd. South
       Suite 5000
17     Las Vegas, NV 89101
       Blaine.Welsh@usdoj.gov
18     *Attorney for Plaintiff*

19

20                                                      */s/ Sara D. Cope*
                                                         CHRISTENSEN JAMES & MARTIN
21

22                                          28

23

24

# EXHIBIT 1

# EXHIBIT 1

1  Evan L. James, Esq. (NSB No. 7760)
   CHRISTENSEN JAMES & MARTIN
2  7440 W. Sahara Avenue
   Las Vegas, Nevada 89117
3  Telephone: (702) 255-1718
   E-mail: elj@cjmlv.com
4
   Brett L. Tolman, Esq. (USB No. 8821) *Admitted Pro Hac Vice (Pending)*
5  Eric G. Benson, Esq. (USB No. 10414) *Admitted Pro Hac Vice (Pending)*
   RAY QUINNEY & NEBEKER P.C.
6  36 South State Street, #1400
   Salt Lake City, Utah 84111
7  Telephone: (801) 532-1500
   Fax: (801) 532-7543
8  E-mail: btolman@rqn.com
           ebenson@rqn.com
9
   *Attorneys for Defendant Jonathan Eborn*
10
   IN THE UNITED STATES DISTRICT COURT
11
   FOR THE DISTRICT OF NEVADA
12

13  FEDERAL TRADE COMMISSION,            Case No. 2:09-cv-01112-GMN-VCF

14          Plaintiff,                   **DECLARATION OF**
                                         **JONATHAN D. EBORN**
15  vs.

16  INFUSION MEDIA, INC., *et al.*,

17          Defendants.

18
        Jonathan D. Eborn, being first duly sworn, deposes and states under penalty of perjury as
19
   follows:
20
        1.      I was one of the owners of Infusion Media, Inc.
21

22

23

24

2.      On June 22, 2009, the Federal Trade Commission ("FTC") filed a complaint that *inter alia* named both Infusion Media, Inc. and me personally.

3.      On June 23, 2009, the Court entered a Temporary Restraining Order ("TRO") against all defendants in the case, including myself, and the majority of my assets were frozen.

4.      At the time of the TRO, I possessed cash that I understood was subject to the asset freeze pursuant to the TRO.

5.      As part of the proceedings, I was required to provide sworn financial statements.

6.      On my July 13, 2009 financial statement, I disclosed the $42,400 in cash that I personally possessed at the time I signed the statement, which represents the amount of cash I understood to be frozen.

7.      As settlement negotiations progressed in the case, and after speaking with counsel, I was informed and understood that I need not surrender those particular fungible bills, but that the amount of cash I possessed at the time of the entry of the TRO would need to eventually be accounted for, if in the end a final judgment were entered or if a settlement with the FTC were reached.

8.      The Stipulated Consent Judgment eventually required that I pay $78,000 in cash, but did not specify that the required $78,000 payment included the $42,400 cash I possessed at the time the TRO was entered.  Through settlement negotiations, however, I understood that this $78,000 payment would settle all claims, and that the $42,400 in cash would be considered part of the settlement amount.

2

9.      I also understood that the Stipulated Consent Judgment superseded any prior seizure order and that my payment of $78,000—along with surrendering all of my property previously seized and in the receiver's possession—settled the matter completely.

10.     At the time the TRO was entered, and at the Receiver's request, I did turn over gold, silver and a cashier's check to my attorneys for safekeeping during the pendency of the case.

11.     So, after disclosing this cash on my July 13, 2009 financial statement, I used some of the money to pay for personal expenses and deposited some of the money into bank accounts. It is my recollection that $23,200 of deposits at issue were part of the $42,400 cash I had on hand when the TRO was entered and which I disclosed in my financial statements.

12.     Despite having used this money, because I understood that the cash I possessed at the time of the entry of the TRO would eventually have to be accounted for at the time of an eventual settlement—as it was—I once again listed the $42,400 in cash on my June 6, 2010 financial statement.

13.     Throughout the tumultuous time period during the pendency of the underlying case, I received financial support from family and friends on numerous occasions.

14.     While many of these cash infusions were outright gifts, others were informal "loans" from friends that would likely have to be repaid at some point, albeit on an informal schedule.

15.     In any event, I never understood that I was required to list post-TRO gifts or informal loans as assets on my financial statements as these monies were used to enable my family to survive in the interim.

16.     I also received more formal loans from PDR Billing that I disclosed on my 2010 financial statement.

17.     Regarding the difference between the $197,700 PDR Billing promissory note in my name and the $292,628.83 disbursed by PDR Billing during this timeframe, it is explained by the fact that PDR Billing transferred money for legal fees to both me and my co-defendant McLain Miller in order for us to fund our defense in the underlying case.  At some point prior to signing the promissory note, the portion of those fees advanced by PDR Billing for legal fees which were reserved for McLain Miller's defense were deducted from my loan amount.  For this reason, the final amount owing on my promissory note is significantly less than the total amount disbursed by PDR Billing throughout this time period.

18.     In reality, much of this money came in and was spent quickly thereafter on my family's expenses.  The rest of the money was deposited in banks over time.

19.     I believe that some of the $61,519 in deposits discussed in the FTC's Motion was part of the $42,400 cash I had on hand when the TRO was entered and which I disclosed in my financial statements and subsequently paid to the FTC as part of the $78,000 payment I made in conjunction with the Stipulated Consent Judgment.  The balance likely came from family and friends to support my family during that difficult time.

4

20.     Without having the benefit of extensive bank documentation and since this occurred approximately five years ago, however, I cannot remember the source and other details regarding each transaction and which deposits were disclosed—as part of the reported $42,400 in cash—and which were gifts and therefore not disclosed.

21.     I also reported earning $44,300 from Augusta Capital between January 1 and June 6, 2010.  In an abundance of caution, I reported this number on my 2010 financial statement— signed halfway through the year in June—based on my projected income that year.  I eventually earned around $95,000 from Augusta Capital that year.

22.     In 2010, I recall receiving around $140,000 or so from Augusta Capital.  Again, without having access to relevant documents and bank records, I am not sure of the exact amount.  Approximately $95,000 of the $140,000 accounts for salary I received for my work at Augusta Capital that year.  The balance of the Augusta Capital money was a loan in order for me to resolve the underlying case and to pay $78,000 to the FTC as part of the Stipulated Judgment Order.  Despite the FTC's assertions to the contrary, I have never been either a principal or officer of Augusta Capital and have likewise never had any ownership in the company.

23.     I also did very little work with Link Media.  McLain Miller ended up working much more extensively with Link Media than I did.  Further, I have never been a principal or officer in Link Media and had no ownership in the company.

24.     I did not disclose certain items of furniture and other miscellaneous items of personal property on my 2010 financial statement for a number of reasons.  For one thing, I did not consider this property to be an asset requiring disclosure because it was purchased with loan

5

proceeds.  Further, during this time I understood that personal property was exempt from the TRO.  Such an exemption was consistent with the receiver's actions after the TRO was entered when the receiver allowed me to remove personal music equipment and instruments from Infusion Media's offices and indicated that the personal property was exempt from the seizure order.

25.     Regarding the Sandy, UT home, my wife solely owned that home.  Early on in the process, the FTC communicated to me that it was not interested in the Sandy, UT home, regardless of its value.  I believe this was the case because even if the Sandy, UT home was to be sold, there was not likely to be any net recovery for the FTC after considering the cost of selling the home, the home's increasing mortgage balance due to my inability to make the payments, and the decreasing value of the home due to the poor real estate market at that time.  Moreover, I do not recall ever having knowledge of a potential homestead exemption or attempting to utilize its provisions.

26.     My family and I moved to the Draper, UT home because we were receiving threatening phone calls in the wake of the FTC lawsuit.  I did not disclose the Draper, UT home as my residence on my 2010 financial disclosure because our plan was to eventually move back into the Sandy, UT property, but that home ended up in foreclosure.  Regardless, the FTC has been in contact with me throughout the entire period, despite my living in Draper.  I picked up the mail at the Sandy, UT home nearly every day, and spent time at that home during the period.

27.     After the underlying case concluded, I was aware that the FTC conducted a number of depositions, including deposing me, but the FTC never provided me with any clear

indication of its suspicions or that it was planning to file the instant Motion.  The FTC never advised me that I was a target of its "enforcement investigation" or provided me with the specifics of the investigation.

28.     Aside from participating in depositions—by being present—and reviewing the accompanying transcripts, the only discovery I have seen to date is that which the FTC has chosen to include as exhibits to its Motion.

29.     I was taken by surprise by the Motion, and until March 25, 2014, was unaware of the exact allegations against me.

1

**VERIFICATION**

STATE OF UTAH                    )
2                                                   :ss
COUNTY OF SALT LAKE   )

3

       Jonathan D. Eborn verifies under criminal penalty of the State of Utah that the foregoing

4

declaration is true and correct.

5

                          DATED this 18th day of April, 2014.

6

7

                          */s/    Jonathan D. Eborn*
                          Jonathan D. Eborn

8

9

10

1279816v1

11

12

13

14

15

16

17

18

19

20

21

22

23

8

24

EXHIBIT 2

EXHIBIT 2

Evan L. James, Esq. (NSB No. 7760)
CHRISTENSEN JAMES & MARTIN
7440 W. Sahara Avenue
Las Vegas, Nevada 89117
Telephone: (702) 255-1718
E-mail: elj@cjmlv.com

Brett L. Tolman, Esq. (USB No. 8821) *Admitted Pro Hac Vice (Pending)*
Eric G. Benson, Esq. (USB No. 10414) *Admitted Pro Hac Vice (Pending)*
RAY QUINNEY & NEBEKER P.C.
36 South State Street, #1400
Salt Lake City, Utah  84111
Telephone:  (801) 532-1500
Fax: (801) 532-7543
E-mail:  btolman@rqn.com
          ebenson@rqn.com

*Attorneys for Defendant Jonathan Eborn*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:09-cv-01112-GMN-VCF |
| Plaintiff, | **DECLARATION OF**<br>**McLAIN MILLER** |
| vs. | |
| INFUSION MEDIA, INC., *et al.*, | |
| Defendants. | |

McLain Miller, being first duly sworn, deposes and states under penalty of perjury as follows:

1.      I was one of the owners of Infusion Media, Inc.

2.      On June 22, 2009, the Federal Trade Commission ("FTC") filed a complaint that *inter alia* named both Infusion Media, Inc. and me personally.

3.      I was part of the Stipulated Consent Judgment that was entered by the Court on October 4, 2010.

4.      Leading up to the Stipulated Consent Judgment, both Jonathan Eborn's and my assets were frozen; however, we needed money to fund our legal defense of the Federal Trade Commission lawsuit.  To pay our lawyers, Mr. Eborn and I obtained unsecured loans from PDR Billing.  Initially, this money was disbursed by PDR Billing in Mr. Eborn's name.  The loan proceeds were used, however, to cover both our legal fees.  At some subsequent point, those fees advanced by PDR Billing for our legal fees that were reserved for my portion of our defense were deducted from Mr. Eborn's loan.

5.      During 2009, I worked extensively with Link Media.  As such, I have knowledge of Jonathan Eborn's relationship with Link Media and the fact that during 2009-2010 Mr. Eborn did very little work for Link Media.

6.      Mr. Eborn was never an owner or principal of Link Media.

1

**VERIFICATION**

2 STATE OF UTAH                    )

                                                  :ss

3 COUNTY OF SALT LAKE   )

4        McLain Miller verifies under criminal penalty of the State of Utah that the foregoing

5 declaration is true and correct.

6                                              DATED this 18th day of April, 2014.

7

                                              */s/  McLain Miller*

8                                              McLain Miller

9 1280004v1

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                                    3

24